# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Jan 05, 2026
s/ llc
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Tracking of
*(Identify the person, property, or object to be tracked )*

a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888 (Honda), as further described in Attachment A

Case No. 26-800M(NJ)

## TRACKING WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government shows there is reason to believe that the person, property, or object described above has been involved in and likely will continue to be involved in the criminal activity identified in the application, and ☑ is located in this district; ☐ is not now located in this district, but will be at execution; ☐ the activity in this district relates to domestic or international terrorism; ☐ other: ______________________.

I find that the affidavit(s), and any recorded testimony, establish probable cause to believe that *(check the appropriate box)* ☐ using the object ☑ installing and using a tracking device to monitor the location of the person, property, or object will satisfy the purpose set out in Fed. R. Crim. P. 41(c) for issuing a warrant.

☑ I find entry into the following vehicle or onto the following private property to be necessary without approval or knowledge of the owner, custodian, or user of the vehicle or property for installing, maintaining, and removing the tracking device: a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888 (Honda), the driveway of 333 North 36th Street, Milwaukee, Wisconsin and/or parking lot of 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

**YOU ARE COMMANDED** to execute this warrant and begin use of the object or complete any installation authorized by the warrant by 1/15/2026 *(no later than 10 days from the date this warrant was issued)* and may continue to use the device until 2/19/2026 *(no later than 45 days from the date this warrant was issued)*. The tracking may occur within this district or another district. To install, maintain, or remove the device, you may enter *(check boxes as appropriate)*

☐ into the vehicle described above ☑ onto the private property described above
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Within 10 calendar days after the use of the tracking device has ended, the officer executing this warrant must both return it to *(United States Magistrate Judge)* Hon. Nancy Joseph and — unless delayed notice is authorized below — serve a copy of the warrant on the person who, or whose property or object, was tracked.

☑ Pursuant to 18 U.S.C. § 3103a(b)(1), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and this warrant prohibits the seizure of any tangible property or any wire or electronic communications (as defined in 18 U.S.C § 2510). I therefore authorize the officer executing this warrant to delay notice to the person who, or whose property or object, will be tracked *(check the appropriate box)*
☐ for ________ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026.

Date and time issued: 1/5/2026 11:09 a.m

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: 26-800M (NJ) | Date and time warrant executed: 01/08/2026 10:22 AM | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of : SA Luke Hepp

Inventory of the property taken and name(s) of any person(s) seized:

GPS location data.

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 08/20/2026

Curt R Hansen

*Executing officer's signature*

Curt Hansen / Special Agent

*Printed name and title*

CLERK'S OFFICE
A TRUE COPY
Jan 05, 2026
s/ llc
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Tracking of
*(Identify the person to be tracked or describe the object or property to be used for tracking)*
a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888 (Honda), as further described in Attachment A

Case No. 26-800M(NJ)

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of 21 U.S.C. § 841, 843, 846, & 856. Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

- ☑ The person, property, or object is located in this district.
- ☐ The person, property, or object is not now located in this district, but will be at the time of execution.
- ☐ The activity in this district relates to domestic or international terrorism.
- ☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

- ☑ evidence of a crime;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ a person to be arrested or a person who is unlawfully restrained.

☑ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:
a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888 (Honda), the driveway of 333 North 36th Street, Milwaukee, Wisconsin and/or parking lot of 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

☑ Delayed notice of ____ days (give exact ending date if more than 30 days: 04/29/2026 ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Curt R Hansen
*Applicant's signature*

Curt Hansen, HSI SA
*Applicant's printed name and title*

Sworn to before me and signed in my presence.

Date: 1/6/2026

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2024R438**

I, United States Department of Homeland Security Investigations (HSI) Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

black 2013 Honda Accord, bearing Wisconsin license plate BBY8888, VIN 1HGCT2B88DA011588

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to install and monitor an electronic tracking device to determine the location of vehicles, more particularly described **a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888, VIN 1HGCT2B88DA011588 (Honda).**

2. I am a Special Agent of HSI, assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been employed with HSI as a Special Agent for approximately five years. Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent.

3. I have been a sworn federal law enforcement officer specifically investigating crimes involving controlled substances, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including distribution of controlled substances and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of Title 8, United States Code, Section 1357(a)(5), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, certain offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code, and other related offenses.

4. Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. I have personally conducted and participated in numerous controlled substances, firearms, gang, and human trafficking investigations and I am familiar with the various methods that criminals use when engaging in these offenses.

5. As part of my duties, I investigate criminal violations relating to controlled substance trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. I also investigate criminal violations relating to unlawfully possessed firearms, firearms trafficking, and possession of machineguns, including criminal violations of Federal firearms laws, including, but not limited to Title 18, United States Code, Sections 922, 933, and 924.

6. I have received training related to the investigations and enforcement of federal human trafficking laws including, but not limited to Title 18, United States Code, Sections 1591, 1594, and 2421. As a result of this training and my experience, I am familiar with the methods traffickers use to recruit, communicate with, and exploit their victims, like by controlled substances and the use of technology. These include posting online advertisements for commercial sex dates, communicating electronically with prospective commercial sex buyers, and distributing sexually explicit images and videos of trafficking victims.

7. I have also received more general training and gained experience in interviewing techniques, search warrant applications, the execution of searches and seizures, and the seizure, processing, and identification of electronic devices.

8. By virtue of my employment as a federal agent and prior experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into drug trafficking conspiracies, firearm offenses, and human trafficking.
b. I have interviewed witnesses, confidential human sources (CS) and sources of information

(SOI) regarding drug trafficking and the distribution of monies and assets derived from drug trafficking(laundering of monetary instruments);

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

l. I am familiar with the language utilized over the telephone to discuss illegal firearms and machinegun conversion devices and know that the language is often limited, guarded, and coded.

m. I have utilized informants to investigate the sale and possession of illegal firearms, and I have also relied upon informants to obtain illegal firearms from dealers.

n. I know that people engaged in the illegal possession or distribution of firearms often use electronic equipment and cellular telephones to conduct firearm trafficking operations.

o. I have interviewed or participated in interviews of witnesses, confidential human sources (CS), and sources of information (SOI) relative to the illegal possession and distribution of firearms.

p. I have engaged in, assisted in and planned undercover operations: to include purchasing illegal substances and arrangement of sex for money transactions.

q. I have engaged in investigations of places of prostitution and drug use and know that drug traffickers will at time trade sexual favors for the payment of drug debts.

9. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization (referred hereinafter as a ("DTO") to have various tasks assigned to persons involved in the

organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances for distribution or firearms for protection/intimidation. The persons higher in the DTO often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

10. I have participated in investigations that have led to the issuance of search warrants involving drug trafficking, firearms offenses, and human trafficking. These warrants involved the search of locations including residences and businesses of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, firearms, and/or human trafficking, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking, firearms, and/or human trafficking.

11. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often drug houses, also called trap houses, are established as places where a variety of drug-motivated crime can occur at a single location. This includes serving as a place where (1) drugs are stored, processed/packaged, sold, and/or used; (2) commercial sex acts are performed in exchange for drugs or money to purchase drugs; (3) stolen goods are sold/traded for drugs or money to purchase drugs; and (4) drug proceeds are stored before they are able to be laundered by the organization. Further, trap houses, also serve the purpose of concealing this illegal conduct from the view of law enforcement. For example, open-air drug markets where drugs are bought and sold on a street corner allow law enforcement to observe hand-to-hand transactions and more easily identify illegal conduct. By contrast, trap houses allow the

trafficker to conduct drug sales behind closed doors and to control who is allowed access to the residence. These types of trap houses are commonly run by persons who are trusted to hold drugs and money and who are usually armed or given armed protection to perform this task. Oftentimes, these trap house operators as well as multiple drug users and others will be within the trap house so as to make it difficult to attribute possession of any drugs found within the trap house during a search conducted by law enforcement.

12. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that drug traffickers may also establish stash houses. I am aware that stash houses are established as places where drug traffickers store large quantities of controlled substances, firearms, and cash. Drug traffickers may establish a trap house and a separate location as a stash house, where drug traffickers do not engage in sales to drug customers at the location, but use the location primarily for storage. Similar to trap houses, stash houses also serve the purpose of concealing this illegal conduct from the view of law enforcement and make it difficult to attribute possession of any drugs, firearms, or cash found within the stash house to a particular individual during a search conducted by law enforcement. For example, stash houses allow the trafficker to store a large amount of controlled substances at a location separate from their residence. Stash houses are often not in the drug trafficker's name, have minimal furniture, minimal signs of typical residential activity, lack items inside connecting the location to the drug trafficker, and are generally a quiet location with limited activity, which avoids drawing complaints or concerns from neighbors or law enforcement.

13. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and

corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including to prove intent, motive, and to identify co-conspirators.

14. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting drug and/or human trafficking investigations, cellular phone data is often a key piece of evidence based on my training and experience. Individuals who sell and use controlled substances and who engage in the trafficking of others often use cell phones to set up a transaction either through traditional means (phone calls or messaging) or by use of special applications downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those individuals who engage in drug trafficking and human trafficking.

15. I am familiar with the technologies of drug traffickers and those engaged in human trafficking. I know that drug traffickers and/or human traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking and/or human trafficking operations. I know drug traffickers and/or human traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and to conduct drug trafficking and engage in human trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and with fellow traffickers and/or human trafficking

victims, customers, co-conspirators, and fellow human traffickers. I know that drug traffickers and/or human traffickers often keep documents and records about drug transportation, drug sourcing, drug ordering, drug sale, drug distribution, victim information, victim posting, posting of advertising, communication with sex trafficking customers, human trafficking proceeds, etc. These documents, records, receipts, notes, and ledgers, regarding drug trafficking and/or human trafficking are often maintained where the traffickers have ready access. These records may be stored within computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers and/or human traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, their drug proceeds, their trafficking victims, and/or customers. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

16. I am currently participating in an investigation of the TARGET DTO and its members and associates. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) recorded jail calls which, prior to the parties' discussion, provided a warning that the calls would be recorded; (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (d) information obtained from witnesses, including confidential sources; (e) administratively subpoenaed and court ordered records; and (f) court authorized communication interception.

17. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

18. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of:

a. possession with intent to distribute and the distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1);
b. maintaining a drug-involved premises in violation of Title 21, United States Code, Sections 856(a)(1) and 856(a)(2);
c. conspiracy to commit those offenses in violation of Title 21, United States Code, Section 846; and
d. use of communication facilities to further and to facilitate the above listed offenses, in violation of Title 21, United States Code, Section 843(b)

(hereinafter referred to collectively as the "TARGET OFFENSES")

have been committed by Jeanette LOPEZ, Samuel P. STAIR, Russell V. MCDADE, Otis LOCKETT, [redacted], DOB: [redacted]/2009 (J.M.L.), Ronald J. HEISEL, Ricky M. CRUZ, Alberto L. BOFFIL Jr., Walter J. RINGERSMA, and other persons as yet unknown (hereinafter "TARGET SUBJECTS"). There is also probable cause to believe that the location of the **Honda** will constitute evidence of those criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses and locations used to engage in the TARGET OFFENSES.

**TIII Authorization**

19. On December 19, 2025, the Honorable J.P. Stadtmueller, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from 414-439-8361 and 414-639-1158, used by LOPEZ.

**PROBABLE CAUSE**

### A. Background

20. Special Agents of HSI, case agents and local officers have received information concerning the illegal drug trafficking activities of members of the Target DTO from confidential human sources (CS#1 and CS#2):

a. CS#1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS#1 began cooperating with law enforcement for consideration on pending criminal drug charges in Forest County beginning in approximately March 2025. CS#1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS#1's cooperation, on May 30, 2025, CS#1 was re-arrested on drug offenses by State Patrol in Outagamie County, and his cooperation ended. This drug conduct was not at the direction of law enforcement and was contrary to CS#1's cooperation agreement. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS#1 is credible and that CS#1's information is reliable notwithstanding CS#1's violation of CS#1's cooperation agreement.

b. CS#2 reported to the case agents with the FBI from approximately March of 2025 to the end of May 2025. In May 2025, CS#2 began cooperating with HSI. CS#2 was initially cooperating with FBI and other law enforcement officers in hopes of receiving third-party consideration for a family member on a felony criminal matter, until May 2025. No consideration has been provided to that family member. CS#2 is now cooperating in exchange for monetary consideration. To date, CS#2

has not yet received any monetary compensation for CS#2's cooperation with HSI. Certain information provided by CS#2 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, and a review of information contained within law enforcement databases. CS#2 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CS#2 has prior felony convictions for Robbery and Manufacture / Deliver Cocaine. I have discussed CS#2's cooperation with the law enforcement officer with whom CS#2 was working in exchange for third-party consideration. Said officer indicated that CS#2 has provided reliable cooperation to that agency and believes that CS#2 is reliable. At no time during CS#2's cooperation with the HSI have I found CS#2 to have provided false information or engaged in untruthful or deceptive behavior. As further detailed below, during controlled operations, the basis of CS#2's information has been confirmed by case agents and determined to be truthful and reliable. Further CS#2's information is based on his/her own personal observations and participation in surveilled controlled operations. Within the context of the information detailed and relied upon for purposes of this application, I believe that CS#2 is credible and that CS#2's information is reliable. CS #2 is currently cooperating with law enforcement.

21. Since approximately May 2024, HSI, Drug Enforcement Agency (DEA), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), the West Allis Police Department (WAPD), and other local agencies have been investigating allegations that members of the DTO are conspiring with each other, and other individuals yet unknown, to operate stash houses and trap houses for the purpose of storing and distributing controlled substances in Milwaukee, Wisconsin and using numerous properties owned by STAIR to engage in their conduct.

22. As part of the investigation, case agents have reviewed numerous recorded jail calls between in custody inmates and MCDADE and recorded jail calls between in custody inmates LOPEZ and STAIR. Case agents have identified MCDADE, STAIR, and LOPEZ by their voices, names, and other facts shared in the recordings that are consistent with MCDADE, STAIR, and LOPEZ. Case agents also identified STAIR's telephone number as 414-732-3682 (the "Target Cell Phone 3"); LOPEZ's telephone numbers as (414) 439-8361 and (414) 639-1158; and BOFFIL's telephone number as 262-234-8917 (the "Target Cell Phone 2"), further outlined below.

23. Based on training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as CS#1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

***<u>STAIR's operation of S2 Real Estate and Ownership of Rental Properties used by the DTO for Drug Trafficking</u>***

24. As detailed above, STAIR is the owner and operator of S2 Real Estate as well as at least 43 Limited Liability Companies in similar names. STAIR, though his LLCs, owns over 100 rental properties throughout the greater Milwaukee area.

25. STAIR, through S2 Real Estate, employs LOPEZ and others.

26. Since approximately May 2024, HSI, Drug Enforcement Agency (DEA), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), the West Allis Police Department (WAPD), and other local agencies have been investigating a Drug Trafficking Organization (DTO) on the south side of Milwaukee, Wisconsin, that distributes fentanyl and cocaine. The DTO has been connected to several overdose deaths and appears to be led by MCDADE.

27. The DTO has been identified as operating out of multiple residences owned by STAIR through his limited liability companies. As part of the investigation, case agents have identified several properties owned by STAIR, which have operated as trap houses or been otherwise involved in the distribution and storage of controlled substances including 712 South 21st Street Milwaukee, Wisconsin, 1512 South 21st Street, Milwaukee, Wisconsin (the "21st Street House") and 1425 West Greenfield Avenue, Milwaukee, Wisconsin (the "14th Street House").

28. On October 14, 2025, MPD executed a state search warrant at the 14th Street House. MPD observed MCDADE, associate of STAIR and LOPEZ, arrive at the 14th Street House as a passenger in a Chevy Trailblazer, bearing Wisconsin license plate BBF-3776 (Trailblazer) shortly before the execution of the warrant.

29. When MPD executed the warrant, MCDADE and others inside the trap house at the 14th Street House attempted to flee out of a window. MPD arrested MCDADE around 11:41 PM. Located on MCDADE was $2,097; a smart flip phone blue Motorola razor with a brown case with stripes; and a black Apple iPhone in a black case.

30. Inside the 14th Street House, MPD located over 140 grams of a substance that field tested positive for cocaine and 90 grams of a substance that field tested positive for fentanyl from a trash can near where MCDADE and others attempted to jump out the window. MPD also located: a Phoenix Arms Raven .25 caliber handgun, numerous ammunition; a gray Samsung touch screen cellphone with a black case; a gray Samsung touch

screen cellphone with a black and pink case; digital scales; drug paraphernalia; suspected drug ledger, and items consistent with cooking crack cocaine. Also located inside the 14th Street House was a camera surveillance system, including DVR systems. The surveillance system located by MPD was consistent with the surveillance system CS#2 described to case agents. MPD also located a document with MCDADE's name on it in a bedroom. Law enforcement also found thousands of hypodermic needles and over a dozen nasal doses of Naloxone, which is used to counter the effects of an overdose. Based on training and experience, I believe that the items located at the 14th Street House are consistent with the residence being used as a trap house.

31. Also located inside the 14th Street House was a partnership agreement between RINGERSMA, STAIR, and [redacted] related to potential funding of remodeling homes in the Milwaukee area. MCDADE's name was also listed on the paperwork, which was dated August 28, 2025. During the investigation into the DTO, case agents were later provided with a dissolve partnership agreement by [redacted]'s mother, [redacted]. The paperwork was dated September 12, 2025, and executed by STAIR and [redacted] LOPEZ was the notary on that document.

32. At the time of the execution of the search warrant at 14th Street House, on October 14, 2025, a male standing across the street hailed police for the purpose of telling them that "Sam Stair" wished to do the board up. Based on my training and experience, I know that the execution of search warrants often results in damage to points of entry (windows and doors) and that sheets of plywood are commonly used by residents or property owners to temporarily secure these entry points until permanent repairs are made. Based on reviewed body camera footage, the unidentified male was on a Facetime call with LOPEZ at the time. Through the Facetime call, LOPEZ advised law enforcement to contact S2 Real Estate to board up the property. Case agents reviewed call record for LOPEZ's telephone (414) 439-8361 and observed seven contacts with STAIR's telephone 414-732-3682 (Target Cell Phone 3) on October 14, 2025. The first contact was an outgoing call at 12:20 PM from LOPEZ's telephone (414) 439-

8361 to 414-732-3682 (Target Cell Phone 3). Case agents then observed at 12:22 PM an incoming call from STAIR's telephone 414-732-3682 (Target Cell Phone 3) to LOPEZ's telephone (414) 439-8361. Case agents also observed an outgoing call from LOPEZ's telephone (414) 439-8361 to STAIR's telephone 414-732-3682 (Target Cell Phone 3) at 12:20 PM, shortly before STAIR was captured on law enforcement body camera at 14th Street House. Case agents also observed three incoming calls from STAIR's telephone 414-732-3682 (Target Cell Phone 3) to LOPEZ's telephone (414) 439-8361 while STAIR appeared to be speaking with law enforcement as outlined below, at approximately 4:27 PM, 4:35 PM, and 4:36 PM, outlined below. Finally, at 2:40 PM there was an outgoing call from LOPEZ's telephone (414) 439-8361 to STAIR's telephone 414-732-3682 (Target Cell Phone 3).

33. Based on law enforcement reports and body camera footage, STAIR later arrived at the 14th Street House around 2:28 PM. STAIR was asked about the renter of the 14th Street House, which information he looked up on his phone and stated to law enforcement that the "lower front" consisted of everything on the first floor of 1425 West Greenfield Avenue. STAIR stated that the upper front resident was moving and the upper rear residence was empty. STAIR stated the lower front tenant was "supposed to be" Adaeliz Mojita (414) 779-6037 and email lavendarc653@gmail. Law enforcement was otherwise aware of this person and knew that this individual was not a resident of the 14th Street House. STAIR told law enforcement: "I try to be as hands on as I can."

34. It is important to note, STAIR did not do any work boarding up the building at the time he was present at the 14th Street House that day. STAIR also appeared to be talking on his telephone while interacting with officers. STAIR's arrival to the trap house is consistent with his attempt to gather information about law enforcement's investigation into the property and to provide law enforcement with false information concerning who controlled the 14th Street House so as to insulate MCDADE and the DTO. Based on my training, experience and investigation into the DTO, LOPEZ's contact with the unidentified male for the purpose of telling law enforcement to contact STAIR is consistent with her role in the DTO as being an intermediary between the drug

traffickers and STAIR. This is further supported by the call records, which demonstrated the ongoing communication between LOPEZ's telephone (414) 439-8361 and STAIR's telephone 414-732-3682 (Target Cell Phone 3) during this period.

35. It is also important to note that STAIR did not provide law enforcement any information regarding MCDADE, despite STAIR's knowledge of MCDADE's connection to the 14th Street House. Indeed, in a later jail call between MCDADE and LOPEZ, LOPEZ expressed that STAIR was upset at MCDADE for damage done to the 14th Street House. Based on my training and experience, this conversation demonstrates LOPEZ's involvement and knowledge in the use of the 14th Street House as a trap house and her status as an intermediary between the drug traffickers renting STAIR's properties and STAIR himself.

***STAIR's References to Renting Properties to Other Drug Dealers***

36. In addition to the evidence above regarding STAIR's rental of properties he owns to MCDADE for the purpose of drug trafficking, the investigation has revealed that STAIR has discussed renting properties for the purpose of drug trafficking with other individuals. I believe this shows that renting properties for the purpose of drug trafficking is part of STAIR's business operations, which he runs with LOPEZ's assistance.

37. Case agents reviewed recorded jail calls to STAIR's telephone 414-732-3682 (Target Cell Phone 3) and found that there was a consistent caller, believed to be William Meeuwsen, who was previously convicted of First-Degree Reckless Homicide - Deliver Drugs in Kewaunee County Case Number 2020CF63. Case agents reviewed all the calls between the person believed to be Meeuwsen and STAIR between May 30, 2025, and July 26, 2025. Case agents located five recorded jail calls from two different facilities; four from the PIN assigned to William Meeuwsen at Jackson Correctional Institute and one from the PIN assigned to Michael Froncek at Winnebago Correctional Institute. During one recorded jail call, STAIR and the inmate discussed a business plan of renting properties to drug traffickers. After noting that the call was being recorded, STAIR quickly stated "just

kidding." Based on my training and experience, and my knowledge of the investigation, I believe that STAIR and Meeuwsen attempted to brush off this conversation, and the idea of renting properties to drug dealers, as a joke because they knew that the conversation was being recorded.

38. The relevant call, between STAIR's telephone number of 414-732-3682 (Target Cell Phone 3) and the PIN of Meeuwsen occurred on July 8, 2025. STAIR discussed how STAIR was working to place inmates in his properties as a halfway house. STAIR discussed how the inmates would come out of jail, and he would use the rooming house for the inmates and inmates engaged in rehab.

**Inmate**: Not to mention Sam, you know what happens, but all that money, all that money, that state money, you can double bubble all day long in there. You know.
**STAIR**: Oh yeah, yeah.
**Inmate**: Oh hell yeah. I mean, I don't know what you are getting now, but... you can..
**STAIR**: Oh yea, that would be nice. I mean, the guys in there now are so bad. Like, we are pretty empty, because, you know, it used to be just drunks and regular folks, and now it's the heroin addicts and they just, you know.
**Inmate**: Oh, they fold over and fall down. Yep.
**STAIR**: Yep. They don't pay a thing. They'll bring in 10 people. They, you know, constantly kicking them out. They can't seem to, you know, make their payment. They get their money and owe their dealer too much. I don't know what it is, but.
**Inmate**: (Laughing) No don't. I was going to say, you're better off getting the dealer to move in (laughing) and work through him. (laughing).
**STAIR:** I know (laughing).
**Inmate:** That's crazy (laughing). That's crazy (laughing). I got an idea. Let's find a couple guys. Let's find a couple guys and make them a dealer. (laughing).
**STAIR**: Yeah (laughing).
**Inmate**: No. Let's not.
**STAIR**: Wouldn't regret it. (laughing).We're recorded. Just kidding.
**Inmate**: Exactly. (Laughing). That's crazy though.
**STAIR**: You almost, you almost think someone would do that. You know, set up.
**Inmate**: You know.
**STAIR**: But I bet, I bet they have the same problem where they can't collect either, so.. (the call continued).

39. Case agents reviewed STAIR's Instagram account (https://www.instagram.com/samstairwi/?hl=en), which was identified by case agents based on STAIR's name and

photos throughout the account (Figure 6).




(Figure 6)

40. On August 6, 2025, less than a month after discussing renting to drug traffickers to increase STAIR's profits, on the recorded jail call with an inmate (in custody regarding a drug trafficking offense that resulted in a death), STAIR posted thanking the drug dealers that were paying him rent (Figure 7). Based on my training, experience, and investigation into STAIR, including statements made by CS#2 and CS#2's discussions with STAIR's employee, LOPEZ, I believe that STAIR and LOPEZ are knowingly renting properties to individuals who are using said properties to store, sell, and use controlled substances (such as MCDADE). Further, I believe STAIR and LOPEZ are profiting from the drug traffickers' illegal conduct.



(Figure 7)

***LOPEZ's Use of LOPEZ's telephone (414) 439-8361 and LOPEZ's telephone (414) 639-1158 to Transition Rental Properties to Other Drug Traffickers after MCDADE's Arrest***

41. As indicated above, MCDADE was arrested on October 14, 2025, after a search warrant was executed on the 14th Street House. MCDADE has been in custody at the Milwaukee County Jail since October 14, 2025.

42. Given MCDADE's absence, at the direction of law enforcement, CS#2 approached LOPEZ to inquire about renting both a trap house and a stash house from STAIR.

43. On November 28, 2025, CS#2 first approached LOPEZ while CS#2 was at S2 Real Estate to do maintenance work. CS#2 reported that during this interaction with LOPEZ there was a conversation about acquiring two "Dope spots" and LOPEZ stated that the price was the rent of the location plus 15% of the profits from drugs sold at the location. CS#2 stated that the conversation took place at approximately 10:20 AM as they both walked to the gas station and LOPEZ purchased a drink.

44. Case agents reviewed pole camera in the area, which confirmed CS#2 was present at during this time. The video showed CS#2 approach S2 Real Estate on foot at 9:47 a.m. and enter the building at 9:49 AM. At 10:17 AM. CS#2 exits the front door of S2 Real Estate and walks across Lincoln out of the view of the camera. Case agents confirmed that the location of the pole camera would not capture the path between S2 Real Estate and the gas station LOPEZ and CS#2 traveled during the drug trafficking conversation. Case agents also observed CS#2 enter the building at 10:57 AM. and exit again at 11:08 AM. Given that this interaction with LOPEZ was not planned, CS#2 was not equipped with a recording device and case agents were not conducting physical surveillance.

45. LOPEZ's call records for LOPEZ's telephone (414) 439-8361 show that she placed two outgoing calls to STAIR's telephone number 414-732-3682 (Target Cell Phone 3) using LOPEZ's telephone (414) 439-8361 shortly after CS#2 left the property the first time. The first call was placed at 10:32 AM, and lasted 3 minutes and 23 seconds. The second outgoing call from LOPEZ's telephone (414) 439-8361 to STAIR's telephone number 414-732-3682 (Target Cell Phone 3) was at 10:43AM and lasted 2 minutes and 48 seconds.

46. Based on my training, experience, investigation into the DTO, review of the pole camera and the call detail records, and CS#2's statement, I believe CS#2 spoke with LOPEZ regarding obtaining two locations to rent from STAIR / S2 Real Estate for drug trafficking, specifically "girl" (which I know is a slang term CS#2 uses for cocaine). I believe that following the conversation between LOPEZ and CS#2, LOPEZ contacted STAIR to further discuss CS#2's request for drug trafficking rental properties with STAIR. This belief is further supported by later recorded calls between CS#2 and LOPEZ outlined below. Further, I believe that the calls from LOPEZ to STAIR are also consistent with LOPEZ not being in charge of the DTO operation, but instead, needing to discuss matters with STAIR for approval. I believe that STAIR and LOPEZ are knowingly renting properties to individuals that they are aware are using those locations for storing, selling, and using controlled substances (like MCDADE). Further, I believe STAIR and LOPEZ are profiting from the drug traffickers' illegal conduct.

47. On December 1, 2025, at the direction of the case agents, CS#2 arranged a meeting with LOPEZ at S2 Real Estate, to further discuss the rental of a drug trafficking house (trap house) and possible stash house (location to store large amounts of controlled substances) which was captured on an audio recording.

48. Case agents equipped CS#2 with a covert recording device and conducted surveillance at S2 Real Estate. Case agents could hear the audio of CS#2's conversations in real-time and were live monitoring the meeting. CS#2 went to S2 Real Estate and met with LOPEZ inside the building. When inside the building, case agents could hear a conversation with CS#2, STAIR, LOPEZ and another individual about building maintenance

issues that CS#2 has been dealing with and other rental business matters. During the conversation, LOPEZ made a joke about the only line on a credit card is one of cocaine. At approximately 12:51 PM, CS#2 and LOPEZ exited the building to discuss the drug trafficking business, which was observed by surveillance. Once outside, CS#2 confirmed with LOPEZ that there were no cameras outside of S2 Real Estate. CS#2 previously informed case agents that STAIR has cameras inside the building that record video and audio. The following is an excerpt of CS#2 and LOPEZ's conversation that was consensually recorded by CS#2:

> **LOPEZ**: We're good. Alright, we're good.
> **CS#2**: But ….(unintelligible) on his way either tonight or tomorrow. That's today.
> **LOPEZ**: Okay.
> **CS#2**: (unintelligible) – two spots
> **LOPEZ**: I though we're gonna start with one
> **CS#2**: Where am I gonna stash my shit? At a hotspot. What the fuck?
> **LOPEZ**: Right.
> **CS#2:** I need a safe spot, Something safe. I don't care, you know. We'll pay you. You…I don't have a problem with that.
> **LOPEZ**: I have a place, buddy. Yeah, I think, I think we should put it over. Yeah, I got place call.
> **CS#2**: Call me tell me how much I need?
> **LOPEZ**: Okay. Address is…Yeah, call me. That's what I said. Let me…
> **CS#2:** I know you have another number.
> **LOPEZ**: Uh, that's the number. Call it. We're talking business now. We're talking money. I'll answer.
> **CS#2**: So anyway, listen you want 15 % powder or cash.
> **LOPEZ**: It depends. It depends on how good it is because I got, I mean, I could do, I could do either or…
> **CS#2**: but this motherfucker, he gonna shut me up in the middle of my operation. And should we just shut him off?
> **LOPEZ**: No, we'll be good.
> **CS#2**: Sure?
> **LOPEZ**: I'm sure.
> **CS#2**: He's not gonna fuck me up, right?
> **LOPEZ**: No.
> **CS#2**: ..he does. I'm get on your ass. Alright.
> **LOPEZ**: Talk to you later.

49. Based on my training, experience, and investigation into the DTO, I believe LOPEZ and CS#2 are

discussing setting up a trap house ("hotspot") where CS#2 can sell drugs and another location for a stash house where CS#2 can store large amounts of drugs ("two spots" and "Where am I gonna stash my shit? At a hotspot. What the fuck?"). Further, I know CS#2 has historically communicated with LOPEZ using LOPEZ's telephone (414) 639-1158. CS #2 has indicated LOPEZ provided him with LOPEZ's telephone (414) 639-1158 to contact her, and he has been using LOPEZ's telephone (414) 639-1158 to contact LOPEZ for at least the last two years. During the conversation, I know CS#2 attempted to see if LOPEZ would communicate with a different telephone number for drug trafficking matters ("I know you have another number"), like LOPEZ's telephone (414) 439-8361. However, LOPEZ told CS#2 to use the telephone number on which they currently communicate (LOPEZ's telephone (414) 639-1158) and that LOPEZ would make sure to pick up when CS#2 calls given that the calls would be about their drug trafficking business ("Uh, that's the number. Call it. We're talking business now. We're talking money. I'll answer."). I further believe that LOPEZ and CS#2 discussed the additional payment LOPEZ would receive for allowing CS#2 to engage in drug trafficking at the S2 properties and whether LOPEZ wanted that payment in cash or in cocaine (CS#2: "So anyway, listen you want 15 % powder or cash." and LOPEZ "It depends. It depends on how good it is because I got, I mean, I could do, I could do either or,). I know that powder is a slang term used by drug traffickers to refer to cocaine that is of a higher purity and not yet mixed or "cooked" with other substances. This allows the drug trafficker the ability to cut or cook the powder cocaine with another substance and, therefore, turn a higher profit. Therefore, I believe that LOPEZ's question concerning the quality of the powder cocaine ("how good") showed LOPEZ's knowledge that cocaine purity equates to profitability. Further, I believe that "motherfucker" referred to STAIR and CS#2 discussed CS#2's concerns that STAIR would stop CS#2 from drug trafficking in STAIR's properties ("but this motherfucker he gonna shut me up in the middle of my operation. And should we just shut him off?"). LOPEZ reassured CS#2 that STAIR would not shut down the drug trafficking operation ("No, we'll be good." and "I'm sure."). Based on my training, experience, discussions with CS#2 and

investigation into the DTO, I believe that LOPEZ's reassurance that STAIR would not shut down the operation is due to STAIR's knowing involvement in the drug trafficking operation. This is further based on other communications involving LOPEZ, as further described below.

50. On December 1, 2025, at approximately 6:31 p.m., at the direction of case agents, CS#2 contacted LOPEZ at LOPEZ's telephone (414) 639-1158. CS#2 attempted to call LOPEZ twice and then texted LOPEZ at LOPEZ's telephone (414) 639-1158**.** CS#2 texted requesting LOPEZ contact CS#2. At approximately 6:43 p.m., CS#2 received a telephone call from LOPEZ's telephone (414) 639-1158**.** CS#2 identified the caller as LOPEZ. This call was received in the presence of case agents and recorded. Case agents later confirmed that this call occurred with LOPEZ's telephone (414) 639-1158 by reviewing pen register/trap and trace data for LOPEZ's telephone (414) 639-1158. Based on the investigation, case agents also recognized LOPEZ's voice on the call as the user of LOPEZ's telephone (414) 639-1158. During the telephone call, LOPEZ and CS#2 further discussed their drug trafficking operations, including possible locations for the trap house and stash house, as outlined in the below paragraphs through paragraph 110. This was confirmed with CS#2, and is consistent with the content of the discussion between LOPEZ and CS#2 wherein they discuss "RO" [MCDADE], who was engaged in drug trafficking with LOPEZ and STAIR in the same area. This call began with LOPEZ discussing a few places she believed would be good for CS#2 to engage in drug trafficking:

> **LOPEZ**: Yeah, I was thinking about it. I got maybe a couple places you guys, they can go take a look at tomorrow and then just check out the scenery where and see what they think before they jump into something, you know?

51. Based on my training and experience, I believe LOPEZ is talking about CS #2 and CS#2's drug-trafficking partner going to view rentals she has picked out (e.g., "I got maybe a couple places you guys…") to determine their suitability for drug trafficking (e.g., "they can go take a look at tomorrow and then just check out the scenery"), prior to setting up a trap house and stash house (e.g., "see what they think before they jump into

something"). I believe this is consistent with LOPEZ's later statements discussing "RO" [MCDADE] drug trafficking in the same area, but warning CS#2 to conduct his drug trafficking business discretely (e.g. "No, not really. 'cause you're in that, you hear what I mean? But you, they just can't be sloppy, you know?"). CS# 2 and LOPEZ arranged for CS#2 to obtain keys the following day for different S2 properties for CS#2 to tour as possible locations for CS#2's drug trafficking operation. LOPEZ discussed a location for the stash house near 23rd Street and College Avenue, Milwaukee, Wisconsin and indicated it would be a good location:

> **LOPEZ:** Oh, okay. Yeah. So I think that'll be the safest 'cause it'll be close to you. Easy access.
> **CS#2:** Yeah. It's a quiet spot.
> **LOPEZ**: Right?
> **CS#2:** Yeah, it is.

52. Based on my training, experience, and investigation into the DTO, I believe LOPEZ discussed the location as being the "safest" because it is close to where LOPEZ believes CS#2 lives and, therefore, this location would provide CS#2 with "easy access" to be able to conveniently bring large amounts of controlled substances to the stash house. I also believe that CS#2 confirms that the stash house is in a quiet location ("quiet spot"), meaning there is not many people coming and going from the location to draw possible negative attention from neighbors and/or law enforcement.

53. During this same call via LOPEZ's telephone (414) 639-1158**,** LOPEZ also discussed having "high traffic" areas and warned CS#2 that "basically people are watching, so you gotta to be careful." Based on my training, experience and investigation into the DTO, I believe this statement is consistent with LOPEZ warning CS#2 that law enforcement heavily patrols the area of this potential stash house. LOPEZ and CS#2 continued:

> **CS#2**: Oh yeah, I got on that part. I'm cool on the security part, but you know, I just need, I just need the people in
> **LOPEZ**: Remember the guy that was over on Greenfield.
> **CS#2**: Huh?

**LOPEZ**: Remember the other guy that was over in Greenfield? I had you go over there a couple times.
**CS#2**: Oh yeah,
**LOPEZ**: Yeah. Well, yeah, he, they got all like all two, like three of his spots.
**CS#2**: How …? I mean, am I gonna have problems with them.
**LOPEZ**: I dunno how I stopped fucking with them. So I dunno how, but I know they did.
**CS#2**: Okay. But I'm saying, uh, you know, we're not gonna have a problem with these people. Right. They're just, nobody gives a shit.
**LOPEZ**: No, not really. 'cause you're in that, you hear what I mean? But you, they just can't be sloppy, you know?
**CS#2**: Okay, I got you.
**LOPEZ**: So, Yeah. So,…. tomorrow….
**CS#2**: You're talking about where RO was?
**LOPEZ**: Yep.
**CS#2**: Okay. Hey, that's a nice. Hey, nice, nice spot.
**LOPEZ**: I was like, it's that spot. But if you don't want that one, there's one right across the street basically in the back. It's a little one bedroom. It's that one. Uh, 'cause they don't need something too big, you know What I mean?
**CS#2**: No, no, not at all. Just doesn't even, I'm not gonna even have the crowds either.
**LOPEZ**: Right. So basically, but it's a good, a good area, you know.
**CS#2**: Okay.
**LOPEZ**: Easy access.

54. Based on my training, experience, and investigation into the DTO, I know that the "guy on Greenfield" and "Ro" to be MCDADE. LOPEZ also discussed CS#2 that LOPEZ previously sent CS#2 to MCDADE's property ("Remember the other guy that was over in Greenfield? I had you go over there a couple times"). In July 2025, CS#2 was sent to fix the security camera at 14th Street House for STAIR and MCDADE. On October 14, 2025, MCDADE was arrested on drug offenses while at the 14th Street House, which is owned by STAIR's LLC, and was a known MCDADE trap house. On October 14, 2025, STAIR also responded to the 14th Street House and stated that he managed a property across the street that his brother owned.

55. Based on my training, experience, and investigation into the DTO, I believe LOPEZ discussed that the new potential trap house for CS#2 is located near MCDADE's old trap house. I further believe that LOPEZ told CS#2 that this is a desirable area for CS#2 to establish a trap house because of drug customers' historic familiarity

with the area due to MCDADE's use of the 14th Street House to sell drugs ("Right. So basically, but it's a good, a good area, you know."). LOPEZ further indicated that this is an "Easy access" location, which I believe meant that it was easy for drug users to quickly purchase controlled substances and then leave the area to avoid law enforcement detection.

56. The conversation between CS#2 and LOPEZ continued (with LOPEZ still using LOPEZ's telephone (414) 639-1158). They discussed STAIR's awareness of the drug trafficking operation:

> **CS#2**: Cool. Hey, so yeah, one more thing. Like the money for the, for the rent and the deposit. Do I give it to you or just I bring it, you know, do I give it to him? To Sam?
> **LOPEZ**: It'll be the same thing with Sam.
> **CS#2**: Oh, okay. So either give it to you or him, it wouldn't matter.
> **LOPEZ**: Well, yeah, the same thing. We'll go through Sam the same thing. I mean he doesn't, you know.

57. Based on my training, experience, and investigation into the DTO, I believe these statements are consistent with STAIR knowingly engaging in renting properties for the purpose of drug trafficking. I believe that LOPEZ told CS#2 that payments for the trap house rental can be made to her or STAIR ("It'll be the same thing with Sam."). CS#2 confirmed that CS#2 can provide payment to LOPEZ or STAIR interchangeably ("So either give it to you or him, it wouldn't matter"). Further, when taken together with LOPEZ's statement to CS#2 during their in-person meeting earlier that day that, in sum, she would accept the 15% profit in cash or cocaine, I believe that LOPEZ is telling CS#2 that STAIR will also accept payment in drugs. LOPEZ responded that "…We'll go through Sam the same thing. I mean he doesn't, you know." Based upon my training and experience, LOPEZ's statements to CS#2, and the overall investigation, I believe that both LOPEZ and STAIR are renting properties to drug traffickers with knowledge of the illicit purposes for which STAIR's properties are being used. Further, I believe that LOPEZ is using LOPEZ's telephone (414) 639-1158 to engage in communications concerning the TARGET OFFENSES.

58. On December 2, 2025, at the direction of case agents, CS#2 went to S2 Real Estate and obtained keys to two rental properties to tour for CS#2's drug trafficking operations. CS#2 later called LOPEZ at LOPEZ's telephone (414) 639-1158 to discuss the rental price. This call was done in the presence of law enforcement and was consensually recorded. I verified that this call occurred using LOPEZ's telephone (414) 639-1158 by reviewing the pen register/trap and trace data for LOPEZ's telephone (414) 639-1158. During the call, LOPEZ is heard speaking to someone in the background. I believe that LOPEZ was speaking with STAIR because she later referred to "Sam" when speaking with CS#2.

**CS#2**: Hey Jeanette.
**LOEPZ**: Hey what's going on?
**CS#2:** (Unintelligible) Right. Yeah, I checked them out. It's nice. I liked it.
**LOPEZ**: I thought so.
**CS#2:** So hey, what is the ticket on that?
**LOPEZ**: Um, take a look real quick. (typing) $725 over which, let me ask what, him, the deposit be like, probable be like, hm, $200 more.
**CS#2**: Ok.
**LOPEZ**: What do you say?
**CS#2**: That's fine. Together, how much it is? Let me know, so I can get the money together.
**LOPEZ**: Oh, okay, okay, let me ask (unintelligible). Because we have a lot of vacancy, that place has be vacant for all time, so I don't think that we post it. (Unintelligible) [CS#2]'s cousin in the little one bedroom on 14th and Greenfield – right?
**CS#2**: Yeah.
**LOPEZ**: It's been vacant, the crackheads just broke in last night, busted the window (unintelligible) brand new window. Um, it's been vacant for months. But [CS#2] has a cousin that he said, um, would take it. Yea. Sam said great.
**CS#2**: Cool.
**LOPEZ**: Ok.
**CS#2**: And, a, hey.
**LOPEZ**: Um.
**CS#2**: Together the one on 23rd and College.
**LOPEZ**: Oh, I don't know, I'm going to ask (unintelligible). I didn't see what that was. So, probably for you, cause they want 1100 for it, but for one of them I'll have them give it to you for $1000 a month.
**CS#2**: Okay.
**LOPEZ**: Let me do, let me talk to, Sam just said yeah. So, I'll talked to (unintelligible) and let her know and send you the numbers.

**CS#2:** Okay. You just text me. Tell me the numbers so I'll, I'll be able to get it together and come see you.
**LOPEZ**: Yep. Okay.
**CS#2:** Appreciate Jeanette, I'll see you soon.
**LOPEZ**: No problem.

59. Based on surveillance, I believe STAIR and LOPEZ were located at S2 Real Estate building at the time of the call. Based on the investigation into the DTO, I am aware that inside the S2 Real Estate building it is equipped with surveillance cameras that record audio and video. Based on conversations with CS#2 and observations made during the investigation, I believe that members of the DTO limit conversations regarding their illegal conduct inside S2 Real Estate building due to this surveillance system and the presence of other individuals. Further based on my training, experience, and investigation into the DTO, I believe that STAIR is very cautious when discussing illegal matters over the phone or around other individuals while at S2 Real Estate. CS#2 also told case agents that, following MCDADE's arrest, STAIR became more cautious with his illegal drug trafficking operation. Therefore, I believe that LOPEZ's statement that a "cousin" wanted to rent the property is a purposeful falsehood by LOPEZ and STAIR to cover up the real purpose of the rental, to be a trap house for CS#2. This is consistent with LOPEZ's prior recorded call with CS#2, when LOPEZ indicated CS#2 could pay with cash or cocaine and that CS#2 could pay LOPEZ or STAIR. I am aware that, as part of CS#2's story to LOPEZ for the rentals of the drug operation, CS#2 identified having a drug trafficking partner. Further, based on my investigation and review of the conversations between CS#2 and LOPEZ, I believe that STAIR authorizes LOPEZ to rent properties to drug traffickers in return for additional fees.

60. Based on my training, experience, and investigation into the DTO, I believe that LOPEZ confirmed that STAIR had approved that CS#2's "cousin" could rent the property on Greenfield Avenue ("Sam said great!"). I believe that LOPEZ also stated that STAIR approved the rental price of $1000 per month for the second drug rental property ("Sam just said yeah."). I further believe that this shows that LOPEZ and STAIR work

together to knowingly rent properties for the purpose of drug trafficking.

61. On December 3, 2025, CS#2 texted LOPEZ at LOPEZ's telephone (414) 639-1158 regarding the stash house, which was consensually recorded by case agents. CS#2 texted LOPEZ's telephone (414) 639-1158 at approximately 6:06 PM about bringing the cash to rent the location and "can you keep them listed as vacant with no name on it?" At 7:46 PM, CS#2 texted LOPEZ at LOPEZ's telephone (414) 639-1158 "?"LOPEZ's telephone (414) 639-1158 texted back "I'm not sure how we'll do that we'll just tell Sam they don't have papers so they can't put in a name." I verified that these electronic communications occurred with LOPEZ's telephone (414) 639-1158 by reviewing the pen register/trap and trace data for LOPEZ's telephone (414) 639-1158.

62. I believe the message from LOPEZ further demonstrates STAIR directing the rental of the stash house and demonstrates STAIRS's efforts to evade law enforcement ("I'm not sure how we'll do that we'll just tell Sam they don't have papers so they can't put in a name.") As previously stated, CS#2 also told case agents that, following MCDADE's arrest, STAIR became more cautious with his illegal drug trafficking operation, which has been consistent with the investigation into the DTO. Based on the investigation into the DTO, including STAIR's prior recorded interaction with law enforcement on October 14, 2025, during MCDADE's arrest, I believe STAIR requires DTO members to provide a renter's name and sign paperwork for rentals, regardless of STAIR's awareness of the drug trafficking operation. I believe STAIR requires DTO members to do this in order for STAIR to evade law enforcement. This is consistent with information provided by CS#2, prior messages between STAIR's telephone 414-732-3684 and MCDADE's phone seized during his arrest, described in more detail below, and his post on social media on August 6, 2025, "the neighborhood drug dealer appreciates all the small bills you give to the corner beggers, so he can pay rent."

63. On December 4, 2025, at the direction of case agents, CS#2 met with STAIR to provide a cash payment for the stash house that CS#2 arranged to rent from STAIR through LOPEZ. The stash house's address is

6290 South 23rd Street, Apartment 8, Milwaukee, Wisconsin (hereinafter "23rd Street House.") CS#2 was equipped with recording equipment and provided with pre-marked money to provide to STAIR during the meeting. Case agents conducted surveillance of CS#2 and observed CS#2 enter the S2 Real Estate building.

64. Case agents later reviewed the recording made by CS#2 of the meeting with STAIR. CS#2 and STAIR discussed other S2 Real Estate matters and STAIR's marital issues. Based on the recording and information later provided by CS#2, I am aware that there was another unknown individual at S2 Real Estate building during the meeting. Based on my training and experience, and the investigation to date, I believe that STAIR is cautious and does not generally discuss drug trafficking matters in the presence of uninvolved persons.

65. During the meeting inside S2 Real Estate, CS#2 spoke with STAIR about making payment for the 23rd Street House. STAIR stated he was actually doing a bachelor pad in the basement of that location. Based on my training, experience, and investigation into the DTO, I believe that STAIR made the statement regarding the bachelor pad to make CS#2's rental of the residence appear legitimate to the unknown person at S2 Real Estate and because of the cameras inside the building.

66. CS#2 then had STAIR count out $2,150 to verify the payment. CS#2 indicated to STAIR that CS#2 had been making arrangements with "Jeanette" regarding the 23rd Street House. STAIR discussed his management of the building. STAIR asked if the payment was for "April Moore" and asked about which apartment as if STAIR was implying that "April Moore" would be renting the apartment. Shortly after, STAIR stated, "I just put her in on 37th Street." Based on my training, experience, and investigation into the DTO, I believe given the presence of another person at the S2 Real Estate building, and STAIR's general caution when discussing drug trafficking matters, STAIR provided a false name for the renter of stash house ("April Moore").

67. CS#2 and STAIR then discussed the location and payment. STAIR asked, "Who is the person moving in?" CS#2 told STAIR to speak with LOPEZ regarding the 23rd Street House. STAIR stated, "Ok." CS#2

then stated, "…you know, no paperwork (unintelligible)." STAIR responded, "We just need, I mean, I don't care, we just need their name and contact number and stuff." CS#2 stated again no papers. STAIR stated that CS#2 can put the residence in CS#2's name and laughs. CS#2 stated "No you don't…," "No…," and "Hell no." Based on my training and experience, I know that those engaged in criminal conduct will often use false names for trap houses, stash houses, or other locations used for drug trafficking. This is done to evade law enforcement detection and to distance the drug trafficker from the location. I further believe that this conversation makes it clear that STAIR is aware that CS#2 intends to use the 23rd Street House for illegal purposes and, thus, refuses to put the property is CS#2's own name.

68. STAIR then asked if "they got money" and asked CS#2 not to "fail" STAIR. CS#2 and STAIR then discussed maintenance issues. I am aware that CS#2 informed LOPEZ that CS#2 is conducting drug trafficking business with another individual and has referred to this other individual in conversations with LOPEZ. Based on these prior conversations, I believe "they" refers to CS#2's drug trafficking partner and STAIR is confirming with CS#2, that the partner has the money for the rental going forward. Further, based on my training, experience, and investigation into the DTO, STAIR's statements are consistent with STAIR's awareness that CS#2 is using the 23rd Street House for illegal conduct, specifically drug trafficking. This belief is further supported by a later telephone call between STAIR and CS#2 and the telephone call between LOPEZ and CS#2 outlined below.

69. At approximately 5:10 PM, CS#2 left the S2 Real Estate building. Once outside, CS#2 received a call from STAIR (using telephone number 414-732-3682 (Target Cell Phone 3)). Only CS#2's side of the conversation could be heard by case agents. CS#2 later told case agents that STAIR discussed having someone sign paperwork for the 23rd Street House. On the recording, CS#2 can be heard telling STAIR that CS#2 will speak to "Jeanette" [LOPEZ].

70. At the direction of case agents, CS#2 texted LOPEZ at LOPEZ's telephone (414) 639-1158 after

the meeting with STAIR, which was consensually recorded by case agents, “I just paid Sam for the apt on 23rd and college he is asking about a name I told him I’ll talk to you, let me know when to pick up the key so I could put my stash in.” CS#2 then followed up with a call to LOPEZ at LOPEZ’s telephone (414) 639-1158**.** This text message and call were placed in the presence of law enforcement and were recorded. I verified that the call and text message were placed to LOPEZ’s telephone (414) 639-1158 and also verified the call on the pen register/trap and trace data for LOPEZ’s telephone (414) 639-1158.

71. During the call with LOPEZ, CS#2 confirmed payment for the 23rd Street House and discussed that STAIR “tried to push” for a name for the location, but CS#2 told STAIR to discuss the matter the LOPEZ. CS#2 confirmed the agreement that no names would be listed to the location, “just like you said, no paper”. CS#2 also discussed that STAIR indicated CS#2 “should make up a name”. CS#2 stated that CS#2 would leave to up to LOPEZ. LOPEZ stated, “okay, okay.” CS#2 also discussed not feeling safe with “it” and “stuff” at CS#2’s residence and that CS#2 wanted to place it at the 23rd Street House. LOPEZ responded, “kay, for sure. Pick it up tomorrow.” Based on my training, experience, and investigation into the DTO, I believe that CS#2 conveyed to LOPEZ that CS#2 wanted to take possession of the 23rd Street House quickly because CS#2 did not want to store controlled substances at CS#2’s home (“…let me know when to pick up the key so I could put my stash in.” and not feeling safe with “it” at CS#2’s residence.). I believe that LOPEZ is aware that “it” and “stuff” refer to controlled substances that CS#2 plans to store at the 23rd Street House. Further, I believe that LOPEZ understands that CS#2 does not want any “paper” meaning rental agreements or other paperwork that would connect CS#2 to the stash house in an attempt to evade law enforcement.

72. On December 5, 2025, at approximately 9:07 AM, CS#2 texted LOPEZ at LOPEZ’s telephone (414) 639-1158 regarding the 23rd Street House. CS#2 messaged, “Hi Could I pick up the key on Monday”. This text message was placed in the presence of law enforcement and was recorded. I verified that this message was

sent to LOPEZ's telephone (414) 639-1158 and preserved the text messages from CS#2's phone. LOPEZ on LOPEZ's telephone (414) 639-1158 then called CS#2 at approximately 9:19:40 AM. This call was received in the presence of law enforcement and was recorded. I verified that this call occurred using LOPEZ's telephone (414) 639-1158 by reviewing the pen register/trap and trace data for LOPEZ's telephone (414) 639-1158. During the call, LOPEZ stated that she no longer wanted to speak in call or text. LOPEZ indicated that she and CS#2 should only speak in person in the future. LOPEZ added that she is very careful and covers her tracks.

73. Based on my training, experience, and investigation into the DTO, I believe that LOPEZ's statements are consistent with LOPEZ's knowledge that she and CS#2 are discussing setting up and operating a drug involved premises and the need to speak face-to-face to thwart law enforcement's ability to investigate her crimes. I am aware through my investigation into the DTO that MCDADE has shared his knowledge of law enforcement investigative techniques with DTO members. I believe that it is likely that that LOPEZ and STAIR are aware of the possibility of a police investigation, particularly given MCDADE's arrest, and, thus, are very cautious in how they handle their drug trafficking operations.

74. Case agents reviewed call/text detail records between STAIR's telephone 414-732-3682 (Target Cell Phone 3) and LOPEZ's telephone (414) 439-8361 for December 5, 2025. During the time LOPEZ was communicating with CS#2 on LOPEZ's telephone (414) 639-1158, LOPEZ appeared to also be texting with STAIR using LOPEZ's telephone (414) 439-8361. Starting at approximately 9:04:37 AM, LOPEZ's telephone (414) 439-8361 texted STAIR's telephone 414-732-3682 (Target Cell Phone 3). At 9:09:07 AM and 9:09:21 AM, LOPEZ's telephone (414) 439-8361 received text messages from STAIR's telephone 414-732-3682 (Target Cell Phone 3). Further, based on my training, experience, and investigation into the DTO, I believe that the text messages between LOPEZ's telephone (414) 439-8361 and STAIR's telephone 414-732-3682 (Target Cell Phone 3) are consistent with STAIR directing LOPEZ on how to respond to CS#2's messages and encouraging LOPEZ to be more cautious

with her phone communications.

75. On December 8, 2025, CS#2 met with LOPEZ at S2 Real Estate to obtain the keys to 23rd Street House. CS#2 was equipped with a hidden recording device. HEISEL was also present. Based on my training, experience, prior surveillance of HEISEL, and the conversation between LOPEZ, HEISEL, and CS #2, on this date, I believe HEISEL is assisting LOPEZ in the DTO by ensuring CS #2 is not working for law enforcement and searching CS #2 for a possible wire.

> **HEISEL**: Do you mean? I I've seen you since Thanksgiving. Did you had on the, the flasher trench?
> **CS #2**: Come on, guys. With that coat, with that shit.
> <laugh>.
> **CS #2**: Why is you so obsessed with that. I'll wear it. Okay. I'll wearing a this.
> **LOPEZ**: That's his police coat. Yeah, that's why
> **HEISEL**: <laugh>. And I see the red light. That's on the top of your head.
> **LOPEZ**: That's where he wore his wire. <laugh>. That his wire.
> **HEISEL**: Jeanette....What'd you say?
> **LOPEZ**: The fuck (unintelligible) No. Okay.
> **Unidentified Female Voice**: Hey, I know, well, you know I worked at Maintenance, right? I'm a whole different department than rental. Right. So they don't communicate until they're after.
> **LOPEZ**: So, so you want a 6290 number eight or five ... you want eight? Okay, that's fine. But did you look at eight? Oh, okay. I just wanted to make sure. Okay. We're good with that, it needs a stove I think.
> **CS #2**: Really? Do I look like I need a stove?
> **LOPEZ**: you look like it, you eat a lot. Definitely. Okay. All right. No, no, no problem. Uh, but that's not the issue. The issue is they rented the 14th and Greenfield to somebody. Yes. That's the issue. I didn't, they just did it on Friday. I didn't find out..(mumble)
> **CS #2**: Why?
> **LOPEZ**: I don't know. I just went and checked it to the other there. I don't know. .... Yeah. So that's what I wanna talk to you about. Sure. So make sure he ain't got no wire Ron. Search him first <laugh>.
> **CS #2**: Who wants to see my tity's?
> **LOPEZ**: Okay.
> **CS #2**: You want to see my titty's?
> **HEISEL**: you got a hair wire, asshole, Asshole.
> **CS #2**: That like, she wants to see titties. Okay. It's not, Hey, come on now. Don't like,
> **HEISEL**: Hey, it look like you have Badger fur. <laugh>.
> **CS #2**: Hey, look, your guys not here. I wouldn't be able to do that if he was here <laugh>,
> **LOPEZ**: but, okay. So, yeah. Um, so I wanted to know, um, if you wanna look at something else? I got someone else
> **CS #2**: right now. I need to get that outta my head.
> **LOPEZ**: Okay.

**CS #2**: Scared the shit outta me.
**LOPEZ**: All right, cool. So let me get you the keys for that then. Okay? Yep. And then what's his name? Just make up a name Sam said.
**CS #2**: Just tell him Mohammad, okay.
**LOPEZ**: Write it on the application. Mohammad. I don't know. Abdul just write it. He said, that's what he told me.
**Unknown Male Voice**: Labooboo, Labooboo
**CS #2**: Fucking Asshole. What you just <laugh>?Okay. On just do it for me please. It's not like I have, listen, it's not like I have every day, all day coming in here, <laugh>.
**LOPEZ**: Really? Is that a fucking doll?
**Unknown Male Voice**: No, that's, that's a, that's an Indian name.
**LOPEZ**: Oh, well LABOOBOO it is name? Yeah. Oh, well Labooboo it is.
**HEISEL** appears to be speaking in the background to someone else and states: I did that after Thanksgiving.
**LOPEZ**: Labooboo it is. I, I don't know. Just he gonna give you the name right now. Okay.
(Unintelligible speaking - Jeanette Appears to yell something in Spanish)
**LOPEZ**: Ron, Can you get keys for 6290 number eight for, honestly,
**HEISEL**: Honestly....were you the one that had it on hold? On the board? It says hold.
**LOPEZ**: No, that's five. I wrote five, but I didn't know he chose eight. So just put eight if he needs to take or eight. He already paid all the money.
**CS #2**: I'm only put a couch.
**LOPEZ**: No problem.
**CS #2**: Couple chairs. Oh my goodness.
**LOPEZ**: Okay. Labooboo it is. All right. 6290. Is that the first name or last name? .
**CS #2**: You signed Labooboo for me.
**Unknown Male Voice**: Doll Labooboo is first name. Doll last name
**LOPEZ**: We need, we need a last name it to
**CS #2**: gimme Indian name.

(During this portion of the recording there are multiple people speaking at the same time, case agent typed only statements that were clearly heard.)

**HEISEL**: It's just put it on there, please.
**LOPEZ**: It's a doll. there you go Labooboo. Muhammed Labooboo, Labooboo Muhammed
**CS #2**: Yeah. Just put on, I put the address on there.
**LOPEZ**: Perfect. Sounds great.
**CS #2**: Alright. Anyway, Allah I'll, uh, lemme get situated.
**LOPEZ**: Alright. And Ron is, getting me the keys.
**LOPEZ**: Yes. Thank you. I you, oh, there it go. <laugh> sign the Labooboo. Really? Boo.
**CS #2**: Fuck
**LOPEZ**: yeah. Here, here, you can sign for Labooboo.
**LOPEZ**: We're happy, right?
**CS #2**: Yeah. And then, uh, excuse me, um,

**HEISEL**: (it appears he speaking again to someone else) Gabriel not even going finish there. Welcome. Just running back.
**CS #2**: What the hell is this? .
**HEISEL**: Mailbox.
**CS #2**: Oh, hey, I got a mailbox. <laugh>.
**CS #2**: Thank you guys, see you guys later, bye.

76. Based on my training and experience, and investigation into the DTO, I believe that HEISEL's conduct demonstrates his knowledge of, and active participation in, LOPEZ's criminal conduct in renting S2 properties for the purpose of drug trafficking. I believe this because (1) HEISEL is present for the interaction between LOPEZ and CS #2; (2) HEISEL did not question the need to pat down a property renter for a government wire; (3) HEISEL did not ask why a property renter would not need a stove at the rental house; (4) HEISEL did not ask why the property renter (CS#2) needed more than one rental location; (5) HEISEL voiced HEISEL's own concerns that CS#2 is cooperating with law enforcement ("Did you had on the, the flasher trench?" and "That's where he wore his wire. <laugh>. That his wire."); (6) HEISEL's statements occurred during the same discussion wherein LOPEZ also expressed concerns regarding a possible government wire ("That's his police coat. Yeah, that's why" and "That's where he wore his wire. <laugh>. That his wire."). I believe that HEISEL and LOPEZ were not joking about this concern even though there is laugher heard on the recording. CS#2 advised me that CS#2 was so concerned about being caught with the recording device that CS#2 lifted CS#2's own shirt to expose CS#2's bare chest, so to discourage HEISEL from physically touching CS#2 and locating the recording device. CS#2 attempted to make a joke of LOPEZ and HEISEL's discussion of government wires; however, CS#2 believed LOPEZ and HEISEL were genuinely concerned that CS#2 was cooperating with law enforcement; (7) prior surveillance observed HEISEL at a trap house owned by S2 Real Estate and rented by MCDADE; (8) HEISEL was present while LOPEZ and CS#2 discussed CS#2 using a fake name to rent the S2 property and HEISEL encouraged LOPEZ to use the name "Labooboo" ("It's just put it on there, please."). HEISEL then appeared to obtain the key

for the stash house as directed by LOPEZ for CS#2 ("Alright. And Ron is, getting me the keys."); and (9) when CS#2 questioned the smaller key provided, HEISEL noted that it is the mailbox key, at which point, CS#2 made a joke about the mailbox ("Oh, hey, I got a mailbox. <laugh>."), again demonstrating CS#2's lack of intent to use for this property for a legitimate purpose. For all of these reasons, I believe that HEISEL is aware of the purpose behind LOPEZ's transaction with CS#2 and the fact that CS#2 is renting the S2 property for illegal purposes necessitating checking CS#2 for wires.

77. Prior to discussing the stash house, LOPEZ directs HEISEL to search CS #2. Based on my training and experience, this conduct is not consistent for an individual renting a property for legal matter, but instead criminal conduct. At the beginning of the meeting, LOPEZ mentioned seeing a "red light" and noted "that's where he was wearing the wire." She laughed, as though it was a joke, but raised the potential that CS#2 was wearing a wire again, ultimately requiring CS#2 to raise his shirt to prove that he was not, in fact, wearing a wire. As he did so, CS#2 joked that she, referring to LOPEZ, just "wanted to see" his "titties." After proving that he was not wearing a recording device, LOPEZ proceeded to discuss handing over the keys and the lease paperwork for the apartment. During the conversation, she asked CS#2 for the name for the paperwork, stating that Sam said to make up a name. CS#2 then provided the name "Muhammad," at which point LOPEZ asked what the made-up last name would be. The three individuals then discussed potential names including "Abdul" and "Labubu (phonetic)." LOPEZ provided CS#2 with the keys, and CS#2 left the meeting. Based on my training, experience, and investigation into the DTO, this DTO is concerned about law enforcement investigations. LOPEZ's conduct is consistent with fears that CS#2 is cooperating with law enforcement in order to obtain evidence of the DTO's operation.

***LOPEZ'S Further Use of LOPEZ's telephone (414) 439-8361 and (414) 639-1158 to Traffic Controlled Substances***

78. Case agents reviewed a recorded jail call from November 10, 2025, from inmate Otis LOCKETT's assigned PIN to LOPEZ's telephone (414) 439-8361**.** I verified that this call occurred with LOPEZ's telephone (414) 439-8361 by reviewing the pen register/trap and trace data for LOPEZ's telephone (414) 439-8361. Case agents conducted a review of Lexis Nexis a Public Record Database which shows that LOPEZ is married to LOCKETT; however, case agents have not been able to confirm their legal marital status. Further, case agents reviewed WIDOT records which indicated LOPEZ and LOCKETT both share the same address of 333 North 36th Street, Milwaukee, Wisconsin, which is owned by STAIR. J.M.L. is a minor son of LOPEZ and LOCKETT.

79. Based on training, experience, and review of the recorded jail call, I believe LOPEZ, LOCKETT, and J.M.L. are drug trafficking. I believe LOPEZ is receiving controlled substances on LOCKETT's behalf while he is incarcerated and then LOPEZ and/or LOCKETT are directing J.M.L. to distribute these drugs and to drug debts.

80. For example, during the recorded call on November 10, 2025, LOPEZ explained to LOCKET that "Junior" was pulled over when "Junior" was going over by "Rick."

> **LOPEZ**: Nothing.
> **LOCKETT:** What?
> **LOPEZ:** Nothing. I had Junior go over by Rick, and go see Rick, and [unintelligible] got pulled over by the police.
> **LOCKET:** What!
> **LOPEZ:** Yes.
> **LOCKETT:** On his way there?
> **LOPEZ:** Yes.
> **LOCKETT:** Oh my goodness, [unintelligible]. What man.
> **LOPEZ:** Actually, what I said. They said he was going 50. I said bro. You going 50 or whatever, how you going 50 in a 30 – 30 residential lane. He like, he started arguing with the police, like, oh, show me the clock, there's no way I was doing 50, or whatever, he was like you can't even go 50 or whatever, he was, I was going 5 over the speed limit, or whatever. He was like show me the 50, he was like I don't have to tell you anything, or whatever. He was like, uh, Junior started arguing with them. He was like, step out of the car and then they called for backup, because Junior was being disorderly, or whatever. They said he arguing with the police. I said bro how you think, far that get you, or whatever, you arguing with the motherfucking police, or whatever, thinking they won't arrest

your motherfucking ass.
**LOCKETT:** Who he with?
**LOPEZ:** Hun?
**LOCKETT:** Who was he with?
**LOPEZ:** By himself.
**LOCKETT:** They still go him?
**LOPEZ:** No. They released him to me …(continues)

81. Based on the recorded jail call and knowledge of the DTO's geographic area of operations, case agents reviewed law enforcement records and identified that a traffic stop occurred on November 10, 2025, in the area of South 19th Street and National Avenue, Milwaukee, Wisconsin. Specifically, in MPD call # C2511101262, MPD officers conducted a traffic stop on November 10, 2025, at approximately 8:06 p.m. which matched details provided during the jail call of "Junior's" traffic stop - an underaged driver, without a license, cited for speeding, and picked up by a mother. MPD officers stopped a black 2013 Honda Accord, bearing Wisconsin license plate BBY8888, VIN 1HGCT2B88DA011588 with a registered owner of Brothers and Sisters Enterprise LLC, with an address of 2316 West Lawn Avenue, Milwaukee, Wisconsin 53209 (Honda). According to the State of Wisconsin Department of Financial Institutions (WIDFI) Corporate Records, Todji Anderson is the registered agent for Brothers and Sisters Enterprise LLC. Further, case agents reviewed Lexus Nexus database and observed Todji Anderson to be associated with 2316 west Lawn Avenue. During a record jail call between LOCKETT and LOPEZ using 414-439-8361, on December 25, 2025, LOCKETT asked LOPEZ to call "Todji". LOCKETT provides the number of 414-530-6797 for Todji and LOPEZ refers to LOCKETT as Todji's brother during the call. Based on my training and experience, I know those engaged in criminal activity, like drug trafficking, will often not title vehicles in their own name, but instead to families' or friends' names or businesses, in an attempt to evade law enforcement.

82. The driver of the Honda was identified as J.M.L. Case agents reviewed MPD Officer Cesar Martinez-Sanchez's body camera from the traffic stop of J.M.L. on November 10, 2025. Case agents observed that

officers never obtained J.M.L.'s phone number during the traffic stop; however, case agents observed J.M.L. with two cellphones on the body camera recording. Case agents also observed that J.M.L. was on a speaker phone call with LOPEZ at the time of the stop, who J.M.L. identified as his mother. Case agents recognized the voice of LOPEZ as the female on the speaker phone call with J.M.L. in the body camera recording. Case agents further observed, moments later LOPEZ arrived at the traffic stop location and identified herself as J.M.L.'s mother. Case agents reviewed the call detail records of LOPEZ's telephone number 414-439-8361 (LOPEZ's telephone (414) 439-8361) during the time of J.M.L.'s traffic stop. Case agents observed on November 10, 2025 at 8:06 PM, LOPEZ's telephone (414) 439-8361 received an incoming voice call from J.M.L.'s telephone number 872-346-3502. Based on my review of MPD's record, MPD initiated J.M.L.'s traffic stop of at the same time, 8:06 PM. Based on my training, experience, review of LOPEZ's and LOCKETT's November 10, 2025 recorded jail call, review of the November 10, 2025 body camera and LOPEZ's telephone (414) 439-8361 call detail records, I believe this is all consistent with LOPEZ's and LOCKETT's son being J.M.L., referred to as "Junior" in the call, and J.M.L. using telephone number 872- 346-3502 to seek assistance from LOPEZ related to the DTO drug trafficking, as further described below. Case agents also observed that LOPEZ's telephone (414) 439-8361 had an outgoing call to CRUZ's telephone (414) 759-8782 at 4:05 PM on November 10, 2025. Based on my training, experience, and the content of the jail call, I believe that CRUZ is the "Rick" that LOPEZ referenced in the jail call with LOCKETT. I further believe that LOPEZ sent J.M.L. to deliver controlled substances to CRUZ and that J.M.L. was traffic stopped before that transaction. This is consistent with the specific wording of LOCKETT's question about when J.M.L. was stopped: "On the way there?," LOPEZ's response "Yes," and LOCKETT's shocked and worried reaction: "oh my goodness." This is so because if J.M.L. was stopped on the way to deliver controlled substances to "Rick" [CRUZ], then he would have those substances in the car with him, which would explain the shock and concern expressed by LOCKETT and LOPEZ about J.M.L.'s violation of traffic laws and

argumentative nature with police

> **LOCKETT:** Well that's over. Don't send him to do nothing. What if he have got in the car with some shit.
> **LOPEZ:** I know. I just didn't think it wasn't the first time I asked him it wasn't no problem or whatever. I'm like Uhhuh,
> **LOCKETT:** He shouldn't have be driving over there anyway, he ain't ready. It's hot as fuck going over there. They give him a ticket or something.
> **LOPEZ:** Yeah, they gave him a ticket for no license and speed. Yeah,
> **LOCKETT:** He's done. You can't get no license now.
> **LOPEZ:** He said as long as he get his permit then he can take it to court. They'll dismiss his ticket.
> **LOCKETT:** Fucking goof.
> **LOPEZ:** So fuck is you want. Exactly what the fuck did you speeding bro? Like you in a rush to go somewhere Monday.
> **LOCKETT:** I don't send him to do that no more. Not over there.

83. Based on my training and experience, I believe "some shit" refers to an unknown controlled substance. This belief is further based on LOCKETT's query, "what if he have got in the car with some shit?" Based on my training and experience, I believe LOCKETT was expressing concern that law enforcement would attempt to search the car during the traffic stop ("what if he have got in the car") and locate the controlled substances ("some shit") J.M.L. possessed to deliver to CRUZ. I also believe that LOPEZ has had J.M.L. deliver drugs on their behalf in the past ("…I just didn't think it wasn't the first time I asked him it wasn't no problem or whatever…"). I also believe that LOCKETT is aware that the area where J.M.L. was travelling to or from to conduct this transaction is the focus of heavy police attention ("…He shouldn't have be driving over there anyway, he ain't ready. It's hot as fuck going over there…").

84. The call between LOPEZ and LOCKETT continued and discussed "shoes" arriving quicker than expected:

> **LOPEZ**: Oh yeah, I meant to tell you too. Uh, I forgot to tell you just slipped my mind. They you that some shoes came today.
> **LOCKETT:** Who?
> **LOPEZ:** Your shoes came today.
> **LOCKETT:** Oh yeah, they did?
> **LOPEZ:** Yeah, I forgot to tell you that earlier. Just slipped my mind.

**LOCKETT:** Oh yeah. You got ‘em.
**LOPEZ:** It came quicker than I thought it was gonna come. I ain't gonna lie.
**LOCKETT:** Yeah, cause when you got those force for me for my birthday they took like, three weeks.
**LOPEZ:** Yeah, I know. Usually, that’s what I’m say [unintelligible]. So I’m surprise it came as quick as it did. So it said ship, but I thought it said ship for verification, it’s probable because it’s not the Holidays yet.
**LOCKETT:** Did you look at them?
**LOPEZ:** Yeah. I looked at them. They nice. They, ah, black and white, and they got some ah, ah, gold like, you know lace on them.
**LOCKETT:** Um-hun. Alright.

85. Based on training and experience, and listening to numerous jail calls, case agents are aware that those engaged in drug trafficking will often use code words while discussing controlled substances on recorded jail lines. Case agents are aware that “shoes” are a common word used by those engaged in the distribution of illegal drugs to refer to drugs. Based on training and experience, I believe that LOPEZ received a delivery of an unknown amount of an unidentified controlled substance on LOCKETT’s behalf and informed LOCKETT that the drugs arrived sooner than expected (“Your shoes came today” and “It came quicker than I thought it was gonna come. I ain't gonna lie.”). I further know that those engaged in drug trafficking try to evade law enforcement detection and will at times make a recorded jail conversation appear ordinary by adding details to the topic, much like LOPEZ discussing how the “shoes” looked (“Yeah. I looked at them. They nice. They, ah, black and white, and they got some ah, ah, gold like, you know lace on them.”). Based on my training, experience, totality of the recorded jail call, and my investigation, I believe LOPEZ and LOCKETT continue to discuss items normally associated with shoes, in an attempt to evade law enforcement. Further, I believe LOPEZ is not speaking about actual shoes because it would not seem reasonable to order actual shoes for an in custody person months prior to his release date. Further, I am aware that when a person is in custody, that individual is required to wear specific approved shoes and/or clothing, which must be ordered through specific authorized vendors that facilitate getting shoes and

other necessary items directly to the prisoners. Therefore, I believe due to the fact that LOPEZ is describing these "shoes" being delivered to her and possessing them, the item LOPEZ and LOCKETT are discussing was not ordered through the authorized vendor for LOCKETT to possess while in custody. Further, LOPEZ appears very concerned with explaining how long it takes for the "shoes" to arrive in comparison to a previous order. I am aware that drug traffickers which use the mail to obtain controlled substances are very conscious with tracking longer arrival times of the controlled substance package, due to the facts that delays can be a sign of law enforcement interception of the controlled substance package.

86. Later in the same jail call, LOPEZ provided the phone to a younger-sounding male who, based on the content of the call, I believe to be J.M.L. I further believe it was J.M.L. based on LOPEZ stating, “Here, your dad wants to talk to you” and then the male begins to speak and towards the end of the conversation, LOCKETT states “put your mama on the phone.” Based on my training and experience, LOCKETT appears to be upset with J.M.L. for not collecting drug debts, for driving poorly and being uncooperative with police:

**J.M.L.:** Hello?
**LOCKETT:** Yo. Why didn’t you go get my money from that [n] bro.
**J.M.L.:** It’s in, it’s in the, it’s in the Honda [appears to be talking to someone else]. Hello?
**LOCKETT:** Why didn’t you get my money from Sean?
**J.M.L.** Shit, he call, he said he was calling me, I ain’t never get none of his calls. And he just now called me today. And –
**LOCKETT:** So what’d you tell him?
**J.M.L.** Hun?
**LOCKET:** What’d you tell him about my money he already owe?
**J.M.L.:** Shit, I told him he can’t get nothing until he pay, until he pay what he owe.
**LOCKET:** Bro, ya’ll letting this [n] hold ya’ll with my money bro. I ain’t never had to deal with that shit [unintelligible]. It’s a whole week and the [n] ain’t pay at all. How the fuck that happen?
**J.M.L.:** I don’t know. I been at that [n] job. I was at that [n] job for like 10 minutes. I was asking the people where he’s at. They was talking about they didn’t know where he’s at. All types of stuff.
**LOCKETT:** Bro, you know where the [n] live, bro. You scared to go to [n] house and why’s you arguing with the police though?
**J.M.L.:** Bro, I wasn’t even arguing with them.
**LOCKETT:** You are dumb bro. What the fuck, bro you let [unintelligible] get away with my money bro. I ain’t never had to waste two weeks to get paid my money bro. You supposed to been on top of

> that shit bro. [Unintelligible] the fuck, what you talking about, you go up there every couple of minutes go get that shit from that [n] bro. He a fucking hype [n]. He not going to sit around. You told him, he can't get none until he pay. What you think he going to do? He going to call somebody else. [N] ain't never going to pay me that motherfucking money bro. Like you scared to check [n] over the fucking money bro.
> **J.M.L.:** No, I check that [n] over 100 times over bro.
> **LOCKET:** You checking good enough, that [n] still paying with you.
> …

87. Based on my training and experience, I know drug traffickers will use "hype" to refer to someone who is addicted to controlled substances. I further know drug trafficking may provide drugs to customers up front and receive payment at a later date, this is often referred to as "fronting". Based on my training and experience, I believe that LOCKETT was upset with how J.M.L. was collecting LOCKETT's drug debts from a drug customer ("What'd you tell him about my money he already owe?"). Based on review of the recorded call, it appears J.M.L. may have told the drug customer that he/she would not receive additional controlled substances from J.M.L. until the drug debt was paid ("Shit, I told him he can't get nothing until he pay, until he pay what he owe."). I believe that LOCKETT then explained to J.M.L. that this refusal to serve the drug customer will not stop the drug user from spending money on controlled substances or getting controlled substances. LOCKETT pointed out that the drug user will just go to another drug trafficker. ("You told him he can't get nothing until he pay. What you think he gonna do? He gonna call somebody else…").

88. The recorded jail call continues between LOCKETT and J.M.L. and they continue to discuss their drug trafficking.

> **LOCKETT:** Yeah, man, I don't trust you to be on 19th. You going to let a motherfucker treat you bro. Then you sitting there talking about motherfucking and you ain't bro, you arguing with the police while you going to do some illegal shit, cuz you about to be fucking quiet.
> **J.M.L.:** Bro, I wasn't even arguing with them, they...
> **LOCKETT:** How, how you asking to see that speedy thing? They don't show nobody that shit. This is Milwaukee, Wisconsin bro. When the fuck you think they going to show you a speed radar? And you calling them bro. And you don't even know your fucking laws bro. You do not need to be driving this shit bro.

**J.M.L.**: I wasn't, I didn't even want to be driving.
**LOCKETT:** You got a motherfucking, you got a ticket, before you even got your shit.
**J.M.L.:** No, I was damn near in my room asleep all type of shit. She came in my room woke me up and told me to go over there.

89. Based on my training, experience, and investigation into the DTO, I believe that LOCKETT states he does not trust J.M.L. drug trafficking in the area of 19th and National given J.M.L.'s lack of ability to collect drug debts and concern over law enforcement detection ("Yeah, man, I don't trust you to be on 19th. You going to let a motherfucker treat you bro."). Further, I believe LOCKETT admonished J.M.L. for his conduct when police pulled J.M.L. over because J.M.L. possessed controlled substances in the vehicle ("Then you sitting there talking about motherfucking and you ain't bro, you arguing with the police while you going to do some illegal shit because you supposed to be fucking quiet."). Also, based on my training and experience, I believe LOCKETT and J.M.L. discuss J.M.L. no longer doing drug transactions with a vehicle, which I believe means J.M.L. will use other methods to continue drug trafficking for the DTO ("You do not need to be driving this shit bro."). J.M.L. discussed that "she" woke him up and made J.M.L. deliver the controlled substances in the vehicle ("No, I was damn near in my room asleep all type of shit. She came in my room woke me up and told me to go over there."). Based on this statement, LOPEZ's earlier statements regarding "shoes" and concerns over J.M.L. conduct at the time of the police interaction, and the relationship between LOPEZ and J.M.L.'s and the toll call between LOPEZ and CRUZ prior to the traffic stop, I believe "she" referred to LOPEZ and that LOPEZ woke up J.M.L. to deliver the controlled substances on LOPEZ/LOCKETT's behalf to CRUZ. Based on my training, experience, investigation into the DTO, and statements made during this record jail call, I believe LOPEZ, J.M.L. and LOCKETT engaged in drug trafficking, even though LOCKETT is in custody.

90. Based on my training, experience, investigation into the DTO, and statements made during this recorded jail call, I believe LOPEZ, J.M.L. and LOCKETT engaged in drug trafficking, even though LOCKETT is

in custody. I further believe that on November 10, 2025, LOPEZ sent J.M.L. to deliver controlled substances to CRUZ; however, J.M.L. was speeding and pulled over by law enforcement. Further, I believe that LOPEZ and LOCKETT were upset with J.M.L.'s conduct, given that law enforcement could have searched the vehicle and located the controlled substances.

91. During the investigation, case agents confirmed J.M.L. resides at 333 North 36th Street, Milwaukee Wisconsin, which is LOPEZ's address through surveillance and review of his traffic stop on November 10, 2025.

92. Case agents believe J.M.L.is the user of **(872) 346-3502 (Target Cell Phone)** because: (1) case agents have reviewed multiple jail calls with Jaylen Lockett, who is believed to be J.M.L.'s brother, and observed numerous calls with **(872) 346-3502 (Target Cell Phone)**. Case agents have listened to recordings of those calls and the voice using **(872) 346-3502 (Target Cell Phone)** is consistent with the voice on the call described below wherein LOPEZ calls LOCKETT (J.M.L.'s father), they discuss "junior". During the call between LOPEZ and LOCKETT, LOPEZ provides the phone to a younger male, after which point LOCKETT discusses the traffic stop and the errors in judgment made by J.M.L. during that stop. The voice in that call is consistent with J.M.L.'s voice in the recorded calls with Jaylen during which J.M.L. uses the number **(872) 346-3502 (Target Cell Phone).** (2) Further, through court authorized interceptions over LOPEZ's telephones 414-439-8361 and 414-639-1158, in conjunction with surveillance, case agents have recognized J.M.L.'s voice on calls using **(872) 346-3502 (Target Cell Phone)** and have observed J.M.L.'s conduct being consistent with the court authorized intercepted calls content as further described below.

***<u>Interception Drug Trafficking Communication with J.M.L.'s telephone 872-346-3502 (Target Telephone Phone)</u>***

93. On December 21, 2025, at approximately 9:06 a.m. and 9:32 a.m., J.M.L., using **(872) 346-3502 (Target Cell Phone),** called LOPEZ at 414-439-8361. J.M.L. advised that "Venezuela just came to the crib with a 55-inch, uh, flat screen TV in a box. I ain't gonna lie, I'm finna grab it." LOPEZ asked, "Why?" J.M.L. replied,

"He asking for, uh, a one point five." LOPEZ confirmed, "That's it?" and J.M.L. affirmed. At approximately 9:32 a.m., J.M.L. using **(872) 346-3502 (Target Cell Phone)** called LOPEZ at 414-439-8361 and said, "I don't think this motherfucker work." LOPEZ replied, "That's why you were supposed to fucking test the bitch before you gave him anything." LOPEZ advised that she would call "Venezuela."

94. Immediately after, LOPEZ, using 414-439-8361, placed several calls and ultimately a text message, at approximately 9:32 a.m., to (414) 800-0398. This text message read, "That tv don't work I want my shit back." Eventually, at approximately 1:54 p.m., LOPEZ, at 414-439-8361 received a call from Venezuela using (414) 800-0398. Some of this conversation was in Spanish and translated by a trained linguist. LOPEZ reiterated that she was upset the tv was broken and said, "I want my money. If you don't have the money, don't reach out." Venezuela asked, "How much? How much? How much?" LOPEZ asked in the background, "How much did you give him, Juni?" Juni replied, "Like one fifty." Venezuela said, "No, but, hey, hey listen. Listen. No, but you are saying the [STAMMERS] gram fifty. Not not, not hundred-fifty." LOPEZ responded, "You smoked? You smoked it, right?" Venezuela answered, "No, I still have some." LOPEZ said, "Okay. Bring me my stuff from earlier." At approximately 2:01 p.m., Venezuela, using (414) 800-0398, sent a text message to LOPEZ at 414-439-8361, which read, "Can you please calm down? I'm not taking advantage of you or anything. I told your son to check it right away, and he gave me 1.5 grams. A gram costs 50, and half a gram costs 30, so that would be 80 dollars in total..."

95. Case agents believe an individual known to LOPEZ and J.M.L. as "Venezuela", using telephone number (414) 800-0398, traded a 55" television to J.M.L. ("Venezuela just came to the crib with a 55" inch, uh, flat screen TV…I'm finna grab it") in exchange for 1.5 grams of crack cocaine ("He asking for, uh, a one point five"). When J.M.L. told LOPEZ that the television did not work, she texted and called Venezuela indicating she wanted the crack cocaine back ("That tv don't work I want my shit back"). While discussing what J.M.L. gave to

Venezuela in exchange for the television, Venezuela confirmed, it was 1.5 grams, not $150 ("No, but you are saying the [STAMMERS] gram fifty. Not not, not hundred-fifty"). LOPEZ asked if Venezuela already smoked the crack cocaine, ("You smoked it, right?"), but he advised that he did not smoke all of it ("I still have some"). Later, Venezuela confirmed through text message that 1.5 grams he received from J.M.L. was only valued at $80 ("A gram costs 50, and half a gram costs 30, so that would by 80 dollars in total"). Case agents know that a gram of crack cocaine will often cost approximately $50 for street-level users.

96. Also on December 21, 2025 at 2:05 PM, J.M.L. was observed on video surveillance exiting the residence of 333 North 36th Street, Milwaukee, Wisconsin and entering the Honda, that was parked directly behind the residence in the alley slab parking spot.

97. On December 22, 2025 at 12:37 PM, J.M.L. was observed on video surveillance exiting the residence of 333 North 36th Street, Milwaukee, Wisconsin and entering the Honda, that was parked directly behind the residence in the alley slab parking spot.

98. On December 22, 2025, at approximately 4:19 p.m., LOPEZ, using 414-439-8361, called J.M.L. at **(872) 346-3502 (Target Cell Phone).** LOPEZ asked, "Umm, you got some smoke?" J.M.L. replied, "No, I'm waiting on Porky, he's supposed to be giving me some more." LOPEZ said, "Alright, find out because 'B' said he got twenty." J.M.L. replied, "I got some for him." LOPEZ continued, "Okay, yeah. Umm, he said he got twenty in cash… And he got, and he got umm, you hit him with the other thing because I didn't even see him yesterday." J.M.L. acknowledged. At approximately 6:34 p.m., LOPEZ, at 414-439-8361, received a call from "B" using (414) 396-1438. LOPEZ advised, "You can come over." "B" replied, "Alright, I'm on my way."

99. On December 23, 2025 at 11:30 AM, J.M.L. was observed on video surveillance exiting the residence of 333 North 36th St, Milwaukee, Wisconsin and entering the Honda. The Honda was parked directly behind the residence in the alley slab parking spot, like prior surveillance.

100. Based on training, experience, and the investigation into the DTO, case agents believe LOPEZ asked if J.M.L. still had marijuana to sell ("you got some smoke?"), but J.M.L. said he did not, but that he was waiting to get additional marijuana from "Porky" ("No, I'm waiting on Porky, he's supposed to be giving me some more"). LOPEZ advised that "B" had $20 cash and wanted marijuana ("'B' said he got twenty… he got twenty in cash") and J.M.L. indicated he still had $20 worth of marijuana to sell to "B" ("I got some for him"). Later, when "B" called LOPEZ, she told "B" that he could come to her residence ("You can come over").

101. On December 27, 2025, at approximately 3:53 p.m., LOPEZ, using 414-439-8361, called J.M.L. at **(872) 346-3502 (Target Cell Phone)**. LOPEZ asked where J.M.L. was and he replied, "Uh, nineteenth, the gas station." LOPEZ said, "Uh, uh, "B" said he got twenty for some weed." J.M.L. replied, "Alright, it in my, uh, it's in my room." LOPEZ asked, "Where?" J.M.L. clarified, "Uh, it should be on my desk. If not, look in that basket." LOPEZ said, "Uh, alright, I'll wait 'til you get to the house so you can give it to him." J.M.L. advised he was getting gas and would be on his way home.

102. Based on training and experience, case agents believe J.M.L. was not at home and LOPEZ was attempting to conduct a sale for marijuana ("Uh, nineteenth, the gas station." and "Uh, uh, "B" said he got twenty for some weed"). Based on training, experience, and investigation into the DTO, I am aware J.M.L. was previously sent to the area of 19th Street in relation to drug trafficking. I am further aware that LOPEZ and LOCKETT have discussed the area of 19th Street in relation to drug trafficking and LOCKETT continuing his drug trafficking conduct out of a location in the 19th Street area once released from custody. Further, case agents know "weed" is a term used by drug users and drug traffickers to discuss marijuana. Case agents believe J.M.L. had the marijuana in his room and directed LOPEZ to obtain the marijuana and sell it to "B" ("Alright, it in my, uh, it's in my room."). However, LOPEZ indicated she would wait for J.M.L. to get home ("Uh, alright, I'll wait 'til you get to the house so you can give it to him.").

103. On December 29, 2025, at approximately 8:46 AM there was an outgoing call from LOPEZ using 414-439-8361 to J.M.L. at **872-346-3502 (Target Cell Phone)**. During this short call they discuss J.M.L. and LOPEZ discuss J.M.L. going to "Layton" for him to complete work at a property, J.M.L. says he will be there around 11 AM. At approximately 9:47 AM LOPEZ using 414-439-8361 calls J.M.L. at **872-346-3502 (Target Cell Phone)** concerning J.M.L. getting to work and another call from LOPEZ using 414-439-8361 to J.M.L. at **872-346-3502 (Target Cell Phone)** at approximately 10:06 AM wherein Jeanette LOPEZ reprimands J.M.L. for not being there yet.

104. On December 29, 2025 at approximately 10:30 AM surveillance video was able to captured of J.M.L. entering the Honda at his residence of 333 North 36th Street, Milwaukee, Wisconsin and then exit the Honda at approximately 10:40 AM when he arrived at S2 Real Estate Building, 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

***Service Provider and Prior Court Order***

105. On May 19, 2025, case agents obtained an order authorizing the installation and use of pen register for 414-514-3794 and 414-439-7468 from Honorable Magistrate Judge Nancy Joseph for both Dish Wireless and AT&T service providers. Case agents served the orders on May 21, 2025 and was informed on May 23, 2025 by Dish Wireless that it is the service provider for 414-514-3794 and 414-439-7468; however it subcontracts services with AT&T, and other networks given its technology limitations. AT&T has been providing case agents information as to the court authorized pen register and trap and trace for 414-514-3794 and 414-439-7468.

106. On June 5, 2025, Honorable Magistrate Judge William E. Duffin authorized court electronic surveillance for 414-514-3794 and 414-439-7468 which case agents served on the service provider.

107. On July 3, 2025, Honorable Magistrate Judge William E. Duffin authorized an extension for court electronic surveillance for 414-514-3794 and 414-439-7468 which case agents served on the service provider.

Information obtained from the Service Provider is consistent with MCDADE engaged in ongoing drug trafficking. This expired in August 2025.

108. On August 19, 2025, Honorable Magistrate Judge Stephen C. Dries authorized court electronic surveillance for MCDADE's prior telephone numbers 414-514-3794 and 414-439-7468 and STAIR's telephone number 414-732-3682 (Target Cell Phone 3) which case agents served. During the investigation, case agents determined MCDADE changed his telephone numbers to 414-460-9608 (Target Cell Phone 1) with IMEI: 356830361124670 and 414-243-1392 with IMEI: 352700320439870 with DISH network. STAIR's telephone number 414-732-3682 (Target Cell Phone 3).

109. On October 1, 2025 Honorable Magistrate Judge Stephen C. Dries authorized court electronic surveillance for MCDADE's telephone numbers 414-460-9608 (Target Cell Phone 1) with IMEI: 356830361124670 and 414-243-1392 with IMEI: 352700320439870 with DISH network. STAIR's telephone number 414-732-3682 (Target Cell Phone 3), which were served on their service provides.

110. On October 31, 2025 Honorable Magistrate Judge Stephen C. Dries authorized court electronic surveillance for TCO drug line 414-460-9608 (Target Cell Phone 1), BOFFIL's telephone number 262-234-8917 (Target Cell Phones 2), and STAIR's telephone number 414-732-3682 (Target Cell Phone 3), which were served on their service provides. On November 25, 2025, Magistrate Judge Dries authorized an extension of the court electronic surveillance for BOFFIL's telephone number 262-234-8917 (Target Cell Phones 2), and STAIR's telephone number 414-732-3682 (Target Cell Phone 3). On December 23, 2025, Magistrate Judge Dries authorized an extension of the court electronic surveillance for BOFFIL's telephone number 262-234-8917 (Target Cell Phones 2), and STAIR's telephone number 414-732-3682 (Target Cell Phone 3).

111. On December 19, 2025, the Judge Stadtmueller authorized the initial interception of wire communications to and from LOPEZ's telephones 414-439-8361 and 414-639-1158 and electronic surveillance.

112. I know that persons who engage in ongoing criminal drug trafficking utilize motor vehicles, like

the **Honda,** to further their activities. I know that traffickers utilize vehicles to travel to location in which they engage in their drug trafficking, such as meeting drug customers, sources of supplies, and other co-conspirators. I also know that drug trafficker will also use vehicles to travel to location in which they store and distribute controlled substances, like stash houses or trap houses. Case agents believed based on the ongoing investigation into the DTO that court authorized GPS tracking of the **Honda** will assist in the investigation of the DTO. I believe that the information obtained from the GPS tracking will help identify other DTO members and potential sources of supply, assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

***Surveillance of the Honda***

113. Case agents believe that J.M.L. is using the **Honda** to assist with drug trafficking and traveling to locations associated to the DTO and DTO members. Case agents are still attempting to identify other locations used by the DTO, other members of the DTO, the source of supply for narcotics and believe that the court order would be beneficial for the investigation.

114. Case agents have conducted physical and electronic surveillance of J.M.L. and have reasons to believe he is operating the **Honda,** which case agents have observed parked in at in the parking slab of his residence located at 333 North 36th Street, Milwaukee, Wisconsin and in the parking lot at S2 Real Estate business located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

115. I believe that tracking the location of the **Honda** will assist in identifying DTO stash locations and aid in identifying the DTO's source of supply and co-conspirators. Based on the above, I believe that J.M.L. is using the **Honda** in connection with Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 856.

116. In order to track the movement of the **Honda** effectively and to decrease the chance of detection, I seek to place a tracking device in or on the **Honda** while it is in the Eastern District of Wisconsin, which was last

observed in the Eastern District of Wisconsin by case agents on December 29, 2025.

117. J.M.L. parks the **Honda** on the parking slab behind his residence located at 1333 North 36th Street, Milwaukee, Wisconsin. STAIR also parks in the parking lot at S2 Real Estate business at 2925 West Lincoln Avenue, Milwaukee, Wisconsin. Case agents believe given the DTO's heighten awareness of law enforcement, concerns regarding being investigated, and awareness of law enforcement techniques in investigating DTOs, also given the cameras on J.M.L. residence and highly public view of S2 Real Estate business, that daytime installation of the GPS tracker would be difficult and would risk detection by J.M.L., LOPEZ, or their neighbors or S2 Real Estate employees and DTO members. Therefore, to ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation and removal of the tracking device for the **Honda** during both daytime and nighttime hours.

**AUTHORIZATION REQUEST**

118. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 authorizing periodic monitoring of the tracking device during both daytime and nighttime hours for a period of 45 days following installation of the device. The tracking device for the **Honda** may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

119. It is further requested that in the event that the **Honda** travels outside the territorial jurisdiction of the court, the order authorize the continued monitoring of the electronic tracking device in any jurisdiction within the United States, pursuant to 18 U.S.C. § 3117.

120. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may

have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of the **Honda** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).